Maxwell, J.
Previous to September, 1897, Endlong was agent of appellant insurance company for the state of Colorado under a contract in writing.
September 9, 1897, Budlong being indebted to the company on account of collections, a modification of Ms contract was made, whereby he was to arrange with The First National Bank of Denver, appellee, to receive the renewals for September and following, to make all collections on the same, carrying the collections to the credit of the company to be drawn by the officers of the company. This modification of the contract was made in the New York office of the company.
Upon Budlong’s return to Denver he turned over to the bank for collection the September renewals.
Under date September 24, 1897, the company from its home office, sent to the bank sundry items for collection and monthly thereafter continued so to do, until September, 1898. During this period the bank permitted Budlong- to take from the bank the items sent to it by the company for collection for the purpose of collecting the items himself, he depositing the proceeds, or a portion thereof, in the bank to the credit of the company.
This method of transacting the business resulted in a loss, to recover which this suit was brought.
*532 Tliis outline will give an idea of the attitude of the parties at the time the action was commenced.
The complaint alleged that between March 22, 1898, and September 23,1898, the plaintiff sent from its New York office to the defendant for collection, sundry items due it from its policy holders, with instructions to the bank to deliver to its policy holders such items, consisting of renewal receipts and notes, upon payment thereof, and to return to the company all unpaid items at the expiration of thirty days from the date when the same fell due; that the defendant bank received such items for collection and undertook to collect the same and to remit the amount collected or return the unpaid items; that the defendant collected all the items so sent it for collection and surrendered to the company’s policy holders the renewal receipts and notes marked paid, and has failed and refused to transmit to the plaintiff the money so collected, although demand therefor has frequently been made by the plaintiff; that the total amount so collected by the defendant, and for which the defendant delivered to the policy holders such renewal receipts and notes, is $1,788.91, which amount the defendant has failed and refused to account for.
Incorporated in the complaint is a list of the items sent by the plaintiff to defendant for collection and alleged to have been collected and unaccounted for by defendant.
Judgment is prayed for the amount above stated.
The answer admits that the plaintiff delivered to defendant for collection, with instructions as alleged in the complaint, the items set forth in the complaint; admits that it received said items for collection with directions to remit to plaintiff all sums by it collected and to return such of said items as were not paid; denies that it collected said items or *533 any of them; denies that it delivered to the policyholders such renewal receipts or any of them; denies that it has failed or refused to "transmit any money collected hy it or to account therefor; denies that it collected the sum alleged in the complaint or any sum; denies that any item set up in the complaint was collected by it or that it failed or refused to account for the same, and denies that it has or retains any money or property of plaintiff.
For a further answer the defendant averred:
“That the plaintiff did deliver to the defendant, for collection, the items and notes in said complaint set out, together with a large amount of other like items and notes; that all said items and notes, except those set up in said complaint, were collected and the proceeds thereof paid by the defendant tó the plaintiff; that the defendant accounted for and returned to the plaintiff each, every and all the items and notes in said complaint set up; and this defendant is informed and believes and upon such information and belief alleges the fact to be that the plaintiff has since, by one Edwin C. Budlong, who was then and there its agent and manager for the state of Colorado, collected a large number, if not all, said items and notes by the plaintiff alleged to have been collected by this defendant. ’ ’
A reply put in issue the affirmative averments of the answer.
At the close of plaintiff’s evidence, defendant moved a nonsuit, which was denied.
At the close of defendant’s evidence, before the proffer or introduction of any rebuttal evidence, the plaintiff moved for a judgment for the plaintiff, which motion was denied, and the court, sua sponte, directed' a verdict for defendant, which was rendered accordingly and judgment entered thereon.
Errors are assigned and argued by appellant *534 ■upon the rulings of the court denying the motion of appellant for judgment, and directing a verdict in favor of appellee sua sponte.
These assignments of error present questions which are purely technical.
We prefer to base our opinion upon the merits of the case, rather than the technical questions raised by these assignments of error, and shall do so. > >
Appellee contends that appellant, having failed to present such an abstract of record as the rules of this court require, the judgment for this reason should be affirmed.
To meet this contention, appellant applied for and obtained leave to file, and filed, a supplemental abstract.
There is no rule of court permitting the filing of supplemental abstracts, by appellant or plaintiff in error, and such practice should be discouraged.
The original and supplemental abstracts combined meet the requirements of the rules of the court, and this matter will not be further considered.
It is contended by appellee, that there is no proof of the existence of a contract between appellant and appellee for the collection by appellee of the items sued for.
Referring to the pleadings as hereinbefore stated, it appears from the complaint that it alleges that the plaintiff, sent to the defendant, for collection, sundry items, specifying them, and that the same were received by the defendant for collection, with instructions relating thereto.
The answer admits that the plaintiff delivered to the defendant for collection sundry items with instructions relating thereto, and admits that the defendant received from the plaintiff said items for collection, including the items specified in the- com *535 p]aint, with instructions to remit to plaintiff all sums collected and to return such items as were not paid.
Fabens v. The Mercantile Bank, 23 Pickering 330, was an action to recover damages for the alleged negligence of the defendant bank in respect to a note left with it for collection. Chief Justice Shaw said:
“We think this question must depend upon the general usage and custom of merchants and bankers, and the implied obligations upon the latter, resulting from their relations, as no special contract was made, and no special instruction given in the present case. We think it very clear upon principle and authority, that by a. general usage, now so well understood as safely to be considered a rule of law, when a bank receives a note for collection, it is bound to use reasonable skill and diligence in making the collection. ’ ’
Substantially the same doctrine is announced in German National Bank v. Burns, 12 Colo. 539.
Many authorities might be cited to the effect, that where a bank receives commercial paper for collection, the law implies a contract upon its part to use reasonable skill and diligence in making the collection.
In addition to the admissions of the answer, there is abundant evidence in the record, consisting of letters of transmittal from the company to the bank and receipts of the bank to the company, establishing beyond controversy the fact that the bank received the items in suit for collection.
It is contended by appellee, that there was no contract between the parties for the reason that there was'no agreement as to what compensation the bank should receive for making these collections.
‘ ‘ The contract to collect is supported by a sufficient consideration, whether a collection charge, termed exchange, be made or not, for the bank fur *536 nishing the accommodation derives benefit from the transaction in the nse for a brief time of the money collected, the advantage to it of interchanging currency at remote points without cost to itself, and the development of its business by serving the convenience of its customers. It follows, therefore, that a bank does not escape responsibility for its negligence in the performance of this duty by the claim that the service was rendered as a gratuity. ’ ’ — 3 Am. & Eng. Ency. of Law, 802, and cases cited.
It is unnecessary to prove an agreement for compensation to be paid a bank for making collections, when it appears that the items were received for collection.
We conclude that the contract was admitted by the answer, it was proved by the evidence, and that proof of an agreement as to compensation was unnecessary.
It is stated that no testimony was introduced by plaintiff to prove that any amount whatever was collected by defendant in pursuance of such contract, even if it be admitted that a contract existed and had been proven.
The testimony of'plaintiff proved that the items sued for were received by defendant for collection; were not returned, nor were they in any manner accounted for to plaintiff.
The testimony of Budlong, introduced by defendant, was to the effect that the items in controversy herein were included in the amount which he had collected and failed to deposit to the credit of the company in the bank.
Thus, if the testimony of plaintiff was deficient upon this point, such deficiency was supplied by the testimony of Budlong, provided Budlong was acting for the bank and not for the company in making the collections.
*537 This brings us to a consideration of the question whether Budlong was the agent of the company or the agent of the bank in making collection of the items turned over to him by the bank, which items had been received by the bank for collection.
The facts as shown by the record áre as follows:
September 9,1897, Budlong was the agent of the company at Denver for the district of Colorado, under a contract in writing to solicit applications for insurance in the company and collect and transmit to the company all premiums, interest and charges on policies and premium receipts sent him for collection. This date, he was indebted to the company on account of collections, in quite a large amount, and, presumably to meet this condition, and protect the company in future collections, his contract with the company was modified, to the effect that he was to arrange with the bank to receive the renewals for September and following, making all collections on same, carrying the collections to the credit of the company, to be drawn by the stated officers of the company. Pursuant to this arrangement Budlong turned over to the bank for collection .the September renewals, taking the bank’s receipt therefor, showing that such items were received for collection. September 24,1897, the company transmitted to the bank sundry items, this letter of transmittal stating:
“Enclosed please find for collection the following October renewals, viz: Total, $1,054.46.
“Mr. E. C. Budlong, Jr., our agent in Denver, will call on you and give you the addresses of the parties and other information you may require.
“All collections on account of these items and any other items that may be sent to you are to be credited to the account of The Manhattan Life Insurance Company, and statement of the account is to be made to us monthly on the first of each month. *538 Drafts on the account will be signed by three officers of the company .whose signatures are attached. Items not paid when due may be held thirty.days aud payment accepted during that time, provided the parties furnish a certificate of good health, blanks for which we enclose. When thirty days passed due all unpaid items should be returned to us.”
In reply thereto the bank, by its cashier, wrote the company as follows :
“Replying to yours of the 24th, with enclosures, we beg to advise you that we have acknowledged receipt of same under separate cover.
“We shall be very glad to handle not only your collections, but any other business you may entrust to us, but at the same time are of the opinion that we should receive a just collection fee.
“We handle a great deal of this business for various insurance companies throughout the country, and in all cases receive at least two per cent, on the total of collections made.
“Kindly advise us whether you are willing to make us that concession, and oblige.”
This letter was transmitted by the company to Budlong with this endorsement thereon:
‘ ‘ Turn over to some other bank.
“J. L. H., V.-P.”
The initials standing for J. L. Halsey, vice-president, as the testimony shows.
October 11, 1897, the company wrote Budlong:
“We have a letter from The First National Bank in which they say they think they should have two per cent, for collecting the renewals. This we canil ot agree to' pay, and if the bank will not make these collections at their regular rate for collecting, please see what you can do with some other good bank- and report, to us, when, if satisfactory, we will change the account.” .
*539 ■ November 20, Bndlong wrote tbe company:
“I ba.ve been endeavoring for several weeks to make arrangements with some one of the. banks to handle our collections at a reasonable rate. I have had several good propositions but found upon pressing matters at the First National a better arrangement could be made there than anywhere else, which I know will be more satisfactory to you as well as myself.
“With the understanding that all notices are to be sent from this office and that no expense or trouble will be given the bank in the matter, they have consented to handle the account without charge other thán the regular clearing-house rate of one-tenth of one per cent, for remittances in New York exchange.
“Under these circumstances, and considering the fact that I have personally seen every policy holder who has paid a premium during the last thirty days, in addition to the expense of postage, etc., I trust you will have no objection to continue paying me two per cent, upon these items. If necessary, I will, of course, stand the exchange charge.
“It seems to me it would be wise to send me a notice of every item or note sent to,the bank, in order that I may duly notify the parties. As you have a number of pink notes there not properly indexed in this office, you.will see the necessity of this. I have been giving these matters the usual attention and from what you said when I was in New York, I understood that there would be no change in my contract on account of items being sent to the bank.”
To which the company replied, December 3:
“Referring to yours of the 20th ult. regarding fee of two per cent, on,old business not procured by you, we would say that we would' be willing to' allow you two per cent, for the collection of same, with *540 the understanding that any collection fee charged by the bank will be paid by you. ’ ’
The record sets forth a large number of letters transmitted from the company to the bank, in each of. which it is stated that the items transmitted are for collection; also the receipts of the bank covering substantially all of the items transmitted.
All of the pertinent correspondence which passed between the company and Budlong, and the bank and the company, prior to the arrangement made by the bank with Budlong, is set forth in the extracts above quoted, and the foregoing letters are the ones which were relied upon by the officers of the bank when they made the arrangement with Budlong to make the collections as hereinafter set forth.
There is no testimony to show that any officer of the bank ever saw or asked to see either the original contract of Budlong, or the modification thereof, of September 9. It seems to have been taken for granted by the officers of the bank that Budlong was the general agent of the company in Colorado, and as such was authorized by the company to make the arrangements which resulted in the turning over to him by the bank of the items which are here in suit, or, that the letters set forth invested him (Budlong) with such authority.
It is unnecessary to cite authorities to the principle that the fact of an agency and the extent and scope of an agent’s authority, cannot be proved by the declarations of the alleged agent, so that all statements and declarations made by Budlong to the officers of the bank as to his authority in the premises, will be eliminated from this discussion.
On behalf of the bank it is contended that Bud-long was the general agent of the company, and as such was authorized to malte the arrangement with *541 the bank which he did, which resulted in the practice above set forth and the subsequent loss.
“A general agent is one who is authorized to do all of the acts connected with the particular trade, business or employment.”
“A special agent is one who is authorized to do one or more specific acts in pursuance of particular instructions or within restrictions necessarily implied from the act to be done.” — Story on Agency, § 17; 1 Am. & Eng. Ency. of Law, 895.
Budlong’s original contract constituted him a special agent for the following purposes:
“To solicit applications for insurance in The Manhattan Life Insurance Company, and to collect and transmit to the party of the first part all premiums, interest and charges on policies and premium receipts sent him for collection in the district of the state of Colorado. ’ ’
The modification of September 9, authorized him:
“To arrange with The First National Bank of Denver to receive the renewals of September and following, making all collections on the same, carrying the collections to the credit of The Manhattan Life Insurance Company of New York, to be drawn by the stated officers of The Manhattan Life Insurance Company.”
There is certainly nothing in either of these documents which made Budlong a general agent of the company to do all the acts connected with his employment; in fact, the modification limits his authority to one act, viz., to arrange with the bank to make the collections.
Conceding to the authority granted by the modification, the widest possible scope, it cannot reasonably be contended that it conferred upon the agent any authority to make an arrangement with the bank *542 which would defeat the intention of the modification, and which would be in direct conflict with the express language thereof.
The only officer of the bank who testified at the trial, the assistant cashier, with whom Budlong transacted this business, testified that he never saw the contract or modification, and in making the arrangement for the bank which he did, he acted upon the assumption, based upon Budlong’s statements and the correspondence, that Budlong had a right to make the arrangement, for the reason that the company, instead of answering the bank’s letter of September 28, returned this letter to Budlong, who presented it to the bank with the notation: ‘ ‘ Turn over to some other bank.”
The witness’ testimony upon this point is as follows:
“Q. You did not ask him for his authority?
“A. No, sir; I did not think it was necessary; at all times he represented himself as agent of the Manhattan company.
“Q. But, Mr. Keeley, as a banker, you do not act upon the representations of an agent?
“A. If I write you a letter and tell you I will do certain things, and you send John Jones to me to make arrangements, I would consider that that man had authority.
“Q. That is not this case; he did not send anybody with a letter.
“A. Yes, sir; he returned Mr. Boss-Lewin’s letter to him, the very letter he wrote, with the notation that if he was not able to make arrangements with us, to go to some other bank.
■ # * * ' * * *
“Q. As a matter of fact, isn’t it true that you took Mr. Budlong’s statement in respect to that matter, about taking them out for collection altogether?
*543 “A. No, I did not; I also took the different.correspondence from the company to him which were in direct line with those we had written.
“Q. What correspondence do you refer to?
“A. I refer to the letter we wrote making a proposition to charge two per cent.; they did not reply to us at all; they wrote Mr. Budlong and told him to see if he could not make a better arrangement; he saw all the banks; he could not make a better arrangement, and he wanted to know if we would not receive the notes and let him do everything in connection with them except checking and remitting, less one-tenth of one per cent., and we said we would do that.
“Q. Didn’t you enlarge some on that letter?
“A. No, sir; I did not.
“Q. There is only one letter?
“A. Yes, sir.
“Q. So whatever can be inferred from it is inferred from that letter?
“A. Yes, sir. And then Mr. Budlong exhibited me a letter in which they agreed that he should receive the two per cent., instead of the bank, and he was to stand the exchange, one-tenth of one per cent. ’ ’
The letter referred to in the last answer is the letter dated December 3, hereinbefore set forth.
This letter should be read in connection with the letter of Budlong to the company, dated November 20, also hereinbefore set forth, and, so read, it fails to show any authority from the company to Budlong to make any arrangement with the bank by which he should be permitted to take the items from the bank and make .the collections himself.
The conclusion is, that there was nothing in the original contract or modification, or any of the correspondence, which warranted Mr. Keeley in assuming- that. Budlong had authority from the company to *544 make the arrangement which he did, and that snch contracts and correspondence do not justify the inference that the company thereby clothed Budlong with apparent authority to make such arrangement.
This conclusion is supported by the fact that, August 3, 1898, the cashier of the bank wrote the company:
“In this connection, I beg to say that I find, much to my surprise, that your agent, Mr. Budlong, seems to have been able to get an influence over all our clerks with whom he has done business. His plan has been that he would come to this bank and give us his own check on The Western Bank for certain of your premium notices, with a deposit slip depositing the amount to the credit of the company, and take the slip away with him; that is to say, none of your policy holders make payments direct to us, but all through Mr. Budlong.”.
From this letter it would seem that, at the time the letter was written, the cashier of the bank was much surprised at the manner in which the business had been transacted. His surprise must have been occasioned by the irregular manner pursued in the transaction of the business.
The bank having undertaken to act as the agent of the company in making the collections, failed to exercise such care in ascertaining the scope and extent of Bhdlong’s authority in the premises, which it might have done by the exercise of ordinary care, as made it liable, under the authorities, to the company for the loss sustained.
It is said that the company ratified the acts of Budlong.
No citation of authority is required in support of the familiar principle, that no ratification can take *545 place without full and explicit knowledge upon the part of the principal of the acts of the agent, claimed to have been ratified.
It is claimed that such knowledge was brought home to the company.
1. By Budlong’s letter of November 20 to the company and the company’s reply thereto of December 3.
The letter of November 20 conveyed no information to the company of the fact that the items sent to the hank for collection were to he collected, not by the bank, but by Budlong, and no information to the effect that the hank was turning over these items to Budlong for collection.
2. Budlong, from time to time, reported to the company upon blanks furnished by the company for that purpose, and it is claimed that these reports showed that Budlong collected these items, the company making no objection thereto.
Budlong testified that these reports did not show by whom the collections were made; that it was impossible to determine from the reports by whom they were made, and that he never informed the company that he had been collecting the items sent to the hank for collection.
The secretary of the company testified, that the company had no notice until August, 1898, that Bud-long was making any of these collections.
There was no ratification by the company of the acts of Budlong, for the sufficient reason, the company had no knowledge of such acts.
For the reasons stated, the judgment will be reversed.

Reversed.

Thomson, P. J„ not sitting.